❐ Original          ❐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>information associated with four Facebook accounts,<br>described further in Attachment A, that is stored at<br>premises controlled by Meta Platforms, Inc. | )<br>)<br>)   Case No.22-1879M(NJ)<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

     An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

     See Attachment A

     I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

     See Attachment B

     **YOU ARE COMMANDED** to execute this warrant on or before 12/14/2022 _____ *(not to exceed 14 days)*
❐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

     Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

     The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____ .
*(United States Magistrate Judge)*

     ❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
     ❐ for _____ days *(not to exceed 30)*   ❐ until, the facts justifying, the later specific date of _____ .

Date and time issued: 11/30/2022 @ 10:13 a.m. _____

City and state:   Milwaukee, Wisconsin _____

*Judge's signature*

U.S. Magistrate Judge Nancy Joseph
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to information associated with Facebook accounts

- PNCC AGENCY BOSS LADIES – MILWAUKEE COUNTY [203072894566928];

- Chappelle Roe [100074755705412];

- BOSS UP Entrepreneurs-Chappelle Roe [1012383023]; and

- the Facebook Page "How to Start a Prenatal Care Coordination Agency – PNCC

that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.    Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities from March 1, 2020 to the present;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from March 1, 2020 to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, advertising ID, and user agent string;

(f) All other records and contents of communications and messages made or received by the user from March 1, 2020 to the present including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g) All "check ins" and other location information;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j) All information about the Facebook pages that the account is or was a "fan" of;

(k) All past and present lists of friends created by the account;

(l) All records of Facebook searches performed by the account from January 1, 2020 to the present;

(m) All information about the user's access and use of Facebook Marketplace;

(n) The types of service utilized by the user;

2

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     Records of any Facebook accounts that are linked to the account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the account); and

(r)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

3

**II. Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1347 (Healthcare Fraud), 18 U.S.C. § 1035 (False Statements Related to Healthcare), 42 U.S.C. Section 1320a-7b (Illegal Kickbacks) involving PRECIOUS CRUSE, MARKITA BARNES, LAKIA JACKSON, AND CHAPPELLE ROE since March 2020, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)  Evidence demonstrating a scheme to defraud Wisconsin Medicaid; evidence demonstrating the provision of kickbacks in exchange for medical services and/or billing; evidence of communications regarding how to conduct billing or avoid detection of billing fraud; communications between or among CRUSE, BARNES, JACKSON, ROE, and other owners or coordinators participating in the fraud; communications between the targets and their clients;

(b)  Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c)  Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d)  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No 22-1879M(NJ). |
| information associated with four Facebook accounts, | ) | |
| described further in Attachment A, that is stored at | ) | |
| premises controlled by Meta Platforms, Inc. | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ❏ contraband, fruits of crime, or other items illegally possessed;
- ❏ property designed for use, intended for use, or used in committing a crime;
- ❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1035 and 1347 and 42 U.S.C. § 1320a-7b | False Statements Related to Healthcare, Healthcare Fraud, and Illegal Kickbacks |

The application is based on these facts:

See Affidavit

- ❏ Continued on the attached sheet.
- ❏ Delayed notice of \_\_\_\_\_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI SA Jill A. Dring
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone _____ *(specify reliable electronic means)*.

Date: 11/30/2022

*Judge's signature*

City and state: Milwaukee, Wisconsin

U.S. Magistrate Judge Nancy Jospeh
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jill Dring, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.   The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since March of 2013.  As a Special Agent, I investigate civil and criminal matters related to health care fraud involving violations of the Health Care Fraud Statute, False Claims Act, Anti-Kickback Statute and Stark Law.  Prior to investigating health care fraud matters, I investigated criminal and national security related computer intrusion matters involving botnets, distributed denial of service attacks, the distribution of SPAM, malicious software, the theft of identification information, and other computer-based fraud. I have received training in computer technology, computer-based fraud and health care fraud.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1347 (Healthcare Fraud), 18 U.S.C. § 1035 (False Statements Related to Healthcare), 42 U.S.C. Section 1320a-7b (Illegal Kickbacks) have been committed, are being committed, or will be committed by CHAPPELLE ROE (DOB: 12/31/1981), LAKIA JACKSON (DOB: 11/17/1989), MARKITA BARNES (DOB: 1/5/1993); PRECIOUS CRUSE (DOB: 6/7/1996), and others known and unknown to the case agents. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

### *Background about the PNCC Program*

5.     By way of background, a Prenatal Care Coordination (PNCC) agency provides services that are reimbursed under Wisconsin Medicaid. The purpose of the PNCC program is to provide access to medical, social, educational, and other services to pregnant women who are considered at high risk for adverse pregnancy outcomes. The components of this benefit are outreach, assessment, care plan development, ongoing care coordination and monitoring, and health education and nutrition counseling.

6.     PNCC services are reimbursed under Wisconsin Medicaid when provided in accordance with Wisconsin Medicaid's rules and regulations. Covered services related to PNCC services are listed in Wis. Admin. Code § DHS 107.34.

7.     When enrolling in Wisconsin Medicaid, the owners of PNCCs sign a provider agreement. In the provider agreement, it states that every time a provider submits a claim they

are certifying that they have not offered, paid or received any type of illegal remuneration in violation of 42 U.S.C. § 1320a-7b, Wis. Stat. § 946.91(3).

8.     The PNCC program requires providers to submit accurate and truthful claims for payments. It also requires a provider to only seek reimbursement for the actual amount of time spent assisting a member. And it prohibits providers from seeking reimbursement for non-covered services. Examples of non-covered services include personal comfort items such as radios and television sets. DHS 107.03(6). Additionally, DHS has explained that if a client is in need of something like diapers or wipes, a care coordinator should connect the client with an organization that can provide those items, rather than providing them. The PNCC program prohibits seeking reimbursement for noncovered services by charging for a covered service that was not actually provided.

9.     Wisconsin Department of Health Services (DHS) maintains an online portal that allows for the submission of allegations of fraud involving Wisconsin Medicaid-funded providers. This online portal assists DHS in its mission to identify and investigate Wisconsin Medicaid fraud. DHS performs its own investigation. When deemed necessary, DHS forwards these investigations as credible allegations of fraud to the Medicaid Fraud Control and Elder Abuse Unit (MFCEAU) to prosecute civil and criminal offenses related to the Wisconsin Medicaid program.

10.     Per Wis. Admin. Code § DHS 107.34, PNCC agencies are required to have a Qualified Professional. Prior to services being performed for a Medicaid recipient by a PNCC, and the subsequent reimbursement by Wisconsin Medicaid, an initial assessment and care plan are required. The Qualified Professional reviews and signs the assessment.

*Background about the Investigation*

<u>We Care Services</u>

11.     An anonymous complaint was received by the Medicaid Fraud Control and Elder Abuse Unit (MFCEAU) on February 3, 2021 through the Forward Health portal.  DHS OIG provided a copy of the complaint it received via its online submission form. The complaint specifically reads, "There are several pncc agencies that are offering enrollment bonuses, group courses, and using DocuSign apps for signatures." As substantiation for the complaint, DHS OIG included screenshots or screen captures of Facebook posts from the Facebook profile Kia Jackson. Kia Jackson is known to investigators as LAKIA JACKSON, owner of We Care Services.

12.     The Facebook posts were posted on 4/22/21, 5/1/21, 5/10/21, 5/12/21, and 6/7/21. LAKIA JACKSON posted to Facebook with posts and text offering enrollment bonuses and giveaways to those who enroll with We Care Services, LLC. For example, multiple posts offer a drawing for those who enroll with We Care Services, LLC, at an event it is holding. The winning prizes are $1000 for First Place, $500 for Second Place, and $250 for Third Place. Another post offered the chance to win $2500 in a drawing to mothers who enroll with We Care Services, LLC. Another post offers $100 gift cards and mimosas to mothers. Lastly, other posts contain information regarding LAKIA JACKSON using the CashApp application to send money to those enrolled as a client with We Care Services, LLC, and the chance for prospective mothers to receive the same money if they sign up. CashApp is a mobile phone payment application by which users can send money to one another.

4

13.     Investigators interviewed numerous women who were clients of We Care Services to determine if they enrolled for services, received any gifts or prizes and whether they received any approved services through the PNCC program.

14.     During an interview of S.E., who has two children, S.E. stated that she did not receive any items such as diapers or baby wipes and did not receive any educational services. Medicaid was billed for services provided to S.E. from 3/26/2020 through 10/22/2021. After reviewing the billing data submitted by We Care Services, S.E. repeated that she did not receive anything.

15.     During an interview of L.F., who has two children, L.F. stated that she received several boxes of diapers, but did not receive any other items and no other services. DHS does not cover free diapers as an approved service under the program. Medicaid was billed for services by We Care Services from 5/8/2020 through 5/3/2021 for services purportedly provided to L.F. L.F. reviewed the number of times the billing data showed she received services and stated that she did not see her care coordinator as often as was suggested by the billing data.

<u>Caring Through Love</u>

16.     On 9/28/21, MFCEAU accepted a credible allegation of fraud referral from DHS OIG. The allegations stated that Caring Through Love, LLC (CTL), offered illegal incentives to its members and/or prospective members to enroll in the program. CTL is owned and was operated by PRECIOUS CRUSE Additionally, there are allegations that CTL, intentionally made false statements or representations of material facts on a claim to obtain payment for services provided without the supervision of a Qualified Professional.

17.     Case agents reviewed the Facebook Account associated with PRECIOUS CRUSE. It included post from 05/27/2021, posted under the account of Presh Hutchinson. It

reads, "Happy Mother's Day To All the Clients Enrolled With Caring Through Love LLC We Appreciate Yall, & I hope Yall Enjoy Your Gifts From Us & Your Day." A photograph and video are attached to the post. In the photo, and screen still from the video, there is $100 in $20 bills in a card.

18.     Case agents sought and received a warrant for CRUSE's Facebook Account. Numerous private message communications confirm that CRUSE was offering incentives and gifts in exchange for women signing up to be clients of CTL. For example, on 4/21/22, CRUSE wrote to a client asking for help with a security deposit: "You would have to show proof that your [sic] moving, like approval for the house. And we offer up to $200 towards the security deposit."  Similarly, on August 19, 2020, CRUSE wrote: "I'm currently helping mommies with infant on getting the necessities they need for their baby. I'm a prenatal care coordinator, & for my clients I provide diapers, wipes, clothes, blankets, bath stuff, etc. If your [sic] interested you would just need state insurance to qualify & I can start the enrollment process."

19.     Other posts on CRUSE's Facebook page make clear that CRUSE was paying for these "free" items by billing Medicaid for services that her agency did not provide.

   a.   For example, on July 12, CRUSE messaged S.H.: "Hey, your coordinator has been trying to reach out to you for at least a month now. She's been getting no response." S.H. responded: "I only talk to her before I had my baby she said that she was going to text me her number but she never did." Billing records show that CTL billed for services purportedly provided to S.H. on July 2, 2021, July 7, 2021, and July 12, 2021.

   b.   Similarly, on July 8, 2021 Facebook user C.S. messaged CRUSE "If I'm one of your clients but don't have a coordinator yet should I still come to the even[t]

6

Sunday?" CRUSE responded: "You are assigned to someone, her name is Damonique. She texted you yesterday about the event but didn't get a response." C.S. wrote: I didn't get a text from her but I just texted her." On September 20, 2021, C.S. messaged CRUSE again, asking: "Hey am I still a client with this agency?" CRUSE responded by asking whether everything was okay and telling C.S. that her coordinator "should only be checking on you once a month while pregnant." Finally, on November 8, 2021, C.S. messaged CRUSE again to say: "Dominique told me to reach out a month before my due date to receive by big gift since I didn't receive anything yet." CRUSE responded: "We give out one big item a month before your due date only if you still need something, such as a car seat, pack & play, swing, Etc." Billing records show that CTL billed for services purportedly provided to C.S. on 4/1/21, 4/15/21, 4/28/21, 5/10/21, 5/26/21, 6/1/21, 6/19/21, 7/9/21, 7/24/21, 8/1/21, 8/20/21, 9/15/21, 10/1/21, and 10/23/21.

20.     Case agents know that CTL received $780,600.07 from Medicaid for purportedly providing services to pregnant and new mothers. A financial investigation revealed that CRUSE spent $35,704 on trips to Las Vegas, $7,052 at local casinos, and $49,935.48 on luxury goods. Additionally, former employee Samone Thomas told investigators that CRUSE paid for all her coordinators and boyfriend to travel to Las Vegas for five days in August 2021.

21.     On November 16, 2022, case agents interviewed Samone Thomas, a former employee of CTL. Thomas reviewed client service records kept by CTL which had her name as the providing coordinator, and which were used to substantiate bills submitted to Medicaid. Thomas told case agents that the information on the records was not accurate. For example, most records indicated that she spent 2 hours providing services to clients on a particular date. Thomas

7

denied spending two hours with a client other than at the initial meeting. She also denied meeting with clients on as many occasions as the records and billing data indicated. Thomas told case agents that CTL had monthly "billing" meetings at which CRUSE directed the coordinators on "doing the billing." She instructed them not to change the description of the services, the time spent with the client, or the date of service on the records. Thomas showed investigators portions of video she took during the meeting. In the video, a woman is seen pointing at a screen showing a record of services provided. The woman pointed to the column listing the services provided and could be heard saying that the information there should not be changed.

22.     Case agents interviewed several clients of CTL. Generally, each client told agents that they received none of the services indicted on the CTL records. The women denied meeting with coordinators as often as indicated in the billing records and some denied knowing the coordinator at all. Many women acknowledged receiving only items, such as diapers, wipes, car seats and, in some cases, fireworks from their coordinators.

c.   For example, on October 3, 2022, case agents interviewed T.I., who was a registered client of CTL. CTL business records demonstrated that Samone Thomas was T.I.'s care coordinator. CTL billed $1,056 to Medicaid for PNCC services purportedly provided to T.I. on 10 separate dates. T.I. told investigators that she signed up for services with CTL at a "community baby shower" at which she received diapers, wipes, and a pack 'n play. T.I. said that she was never thereafter contacted by anyone with CTL and received no services. The first day of service billed for T.I. was August 6, 2021. T.I. states that she was in the hospital recovering from the birth of her child that day and did not meet anyone

8

from CTL that day. Thomas admitted that she did not know T.I. and likely did not provide services to her.

d.  Similarly, on October 3, 2022, case agents interviewed T.W. T.W. was a client of CTL. CTL billed $2,112 for services purportedly provided to T.W. on 22 separate occasions. She indicated during the interview that she received no services and only had one meeting with a representative from CTL. Samone Thomas was listed as T.W.'s care coordinator. Thomas stated that CRUSE told her that T.W. was not eligible to be Thomas's client because she was receiving services from another entity. Thomas acknowledged that she did not provide services to T.W. on 22 occasions as indicated in the billing records.

## Here For You

23.  On 9/28/21, MFCEAU accepted a credible allegation of fraud referral from Department of Health Services (DHS) Office of the Inspector General (OIG) pertaining to Here For You Prenatal Coordination Services LLC, a Prenatal Care Coordination (PNCC) agency owned by Markita Barnes.

24.  On 2/3/21, DHS received a complaint via this online submission portal. DHS launched and completed an investigation based on that complaint and then forwarded a credible allegation of fraud to MFCEAU.

25.  DHS OIG provided a summary of the complaint received via its portal, informing MFCEAU that the complainant reported that Here for You Prenatal Coordination Services LLC (HFY) was offering $500 enrollment bonuses. Included with the complaint submitted to the portal was a Facebook screenshot of a post by a user with the display name of Tim Winters. Winters offers his thanks to Markita Barnes for partnering with him and tells women and

9

mothers to contact Barnes for a $500 enrollment bonus. A screenshot or screen capture is a digital image that shows the content of a computer or digital display.

26.      DHS OIG Provider Research Specialist Melanie Carroll accessed Facebook using a Facebook profile made for research purposes to investigate the claim sent to the portal. Carroll accessed multiple posts that appeared to support the claim that Here For You Prenatal Coordination Services was offering illegal incentives to prospective clients. Carroll provided screenshots of the posts she found in the credible allegation of fraud referral that was sent to MFCEAU.

27.      The screenshots provided by Carroll are from three separate Facebook user profiles with the names MARKITA BARNES, Aubrianna Shackelford, and More Focused. Per DHS OIG, and the Facebook posts themselves, MARKITA BARNES is the owner of Here For You Prenatal Coordination Services LLC, and Aubrianna Shackelford is a care coordinator. More Focused, based on names used in the images of multiple posts, is the display name for the Facebook account used by Taneisha Tate. Tate is a care coordinator for Here For You Prenatal Coordination Services.

28.      The Facebook posts were posted on 2/4/21, 2/21/21, 2/16/21, 3/9/21, 4/1/21, and 5/7/21. The accounts of BARNES, Shackelford, and Tate each posted multiple images, with text offering enrollment bonuses, often in the amount of $500 for those who sign with Here For You Prenatal Coordination Services. The posts also offer welcome baskets filled with gifts, free items such as car seats and diapers, and monthly raffles with prizes such as flat screen televisions and bill payment. A post by MARKITA BARNES on 5/7/21 names the winners of a raffle put on by Here For You Prenatal Coordination Services. The three winners won, in total, a getaway to Las Vegas, Miami, or California, a full body massage, and a Visa gift card.

10

29. Case agents interviewed several women who were clients of HFY for whom HFY billed for services purportedly provided. Like the women who were clients of CTL and WCS, the clients of HFY generally stated that they did not receive the services contained in HFY's records, and were not in contact with their care coordinator with the frequency for which HFY billed. Many noted that they received no services whatsoever. Others noted that they received only items, such as diapers and wipes.

30. HFY received over $1.1 million in reimbursements from Wisconsin Medicaid.

<u>Connections between the Agencies</u>

31. In May 2022, the Milwaukee Journal Sentinel published an article regarding the PNCC program focused on a Milwaukee nurse, Vivian Mealing. The article noted that Mealing told reporters that she was hired by WCS, HFY, and CTL after those agencies were referred to her by CHAPPELLE ROE.

32. According to records kept by DHS in the regular course of its official business, Vivian Mealing, RN, was listed as the Qualified Professional at CTL, WCS, and HFY. Barbara Hayden, an OIG nurse consultant, contacted Vivian Mealing, and during a conversation that occurred on 3/31/21, Mealing informed Hayden that she had yet to perform any services for CTL. Mealing also said that she believed HFY was not approved to provide services; Ms. Hayden informed her that was not true, as HFY had been enrolled as a PNCC since October 22, 2020. With respect to WCS, Mealing said she worked for that entity 1-2 hours per week.

33. On August 7, 2021, Facebook user Tatiana Harris messaged LAKIA JACKSON to say she was starting a PNCC, was looking for a nurse and nutritionist and that "I paid this ladie [sic] 3000 but she got on bs." JACKSON responded: "Was her name Chapelle [sic]" and Harris sent a picture of an email she received from BOSS UP Entrepreneurs. The email

contained a picture of CHAPPELLE ROE. JACKSON confirmed that was ROE and said: "I went through Chapelle [sic] too." Harris then told JACKSON she had originally contacted a nurse who subsequently declined because she was under investigation. JACKSON said that was "my nurse now her name Vivian" and Harris confirmed it was hers also.

34.    Case agents have traced several payments from JACKSON to ROE or entities associated with her, including a $225 payment on 11/27/20 from JACKSON to BOSS UP Entrepreneurs, a $1,421.40 payment from JACKSON to ROE on 8/14/20, and a $1,750 payment from JACKSON to ROE on 3/6/20.

35.    CHAPPELLE ROE is listed as a Facebook contact on the Facebook pages of BARNES (HFY); CRUSE (CTL) and JACKSON (WCS).

36.    Based on the records received to date, including Facebook communications, as well as interviews with over a dozen clients of the three PNCC agencies referenced herein, the pattern of fraudulent conduct appears similar (if not identical) at each of the agencies. The Facebook pages of JACKSON, CRUSE, and BARNES have communicated with one another.

37.    On June 8, 2021, United HealthCare (UHC) wrote a letter to the Division of Medicaid services expressing concern over the PNCC program. The letter indicated that UHC had submitted two fraud tips regarding PNCC agencies enrolling members without their consent or knowledge and multiple agencies billing for the same member and timeframe. In the letter, UHC identified a Facebook Group titled "How to Start a Prenatal Care Coordination Agency." UHC wrote that the associated website shows the company to be based in the Milwaukee area and run by CHAPPELLE ROE. UHC wrote that ROE was the representative for "A Beautiful Start to A Brighter Future" PNCC. The writer wrote that based on posts on the "How to Start a

12

Prenatal Care Coordination Agency" page, it appeared that multiple current PNCCs have used this entity for assistance.

38.　　CRUSE's Facebook records also indicates that she paid someone to assist her in setting up her PNCC business because on March 11, 2021, Facebook user V.W. messaged CRUSE (owner of CTL): "I typed in prenatal care coordinator in the search bar and you came up. I was wondering if you could tell me how could I get into this field as a provider." CRUSE responded: I be extremely busy. But so I paid $3500 for someone to help me open not including the additional fees from the state. So I wouldn't charge anything less than that…."

*Information about Facebook Accounts*

<u>PNCC Agency Boss Ladies – Milwaukee County ("Boss Ladies' group")</u>

39.　　On January 26, 2022, the Facebook profile associated with BARNES searched Facebook for "PNCC Agency Boss Ladies – Milwaukee County."

40.　　JACKSON's Facebook page is associated with the Boss Ladies' group.

41.　　The Boss Ladies group is a private Facebook group that has 415 members. It was created a year ago, though the public-facing page does not provide the exact date. As of November 17, 2022, the public-facing page indicated that it has 26 posts in the last month.

42.　　The public-facing information states that the group is only for individuals who want to own a PNCC agency or currently own one. It states that the group will provide training, "introduce vendors and partnerships," and "marketing strategies."

43.　　Given the connections between the targets and the similarities of the fraudulent schemes engaged in by the various prenatal care agencies, there is reasonable cause to believe that evidence of the crimes described above will be found in the Boss Ladies' group. Additionally, during the interview on November 16, 2022, Thomas mentioned "posts" about all

"this" that occurred relatively recently. And given that the page remains active despite the fact that many of the PNCC agencies have been suspended from Medicaid, there is probable cause to believe that discussions about the investigation are ongoing and occurring in this group.

#### How to Start a Prenatal Care Coordination Agency – PNCC

44.　　Case agents located the Facebook page "How to Start a Prenatal Care Coordination Agency – PNCC". It contains an image with the following contact information: contact us 414-998-0125, info@croefs.com.　An open source search for the phone number 414-998-0125 revealed that the phone number is associated with BOSS UP Entrepreneurs LLC, which is owned by CHAPPELLE ROE.

45.　　Given the connection between ROE and the prenatal agencies under investigation and the fact that the scheme to defraud appears similar, if not identical, across the agencies, there is probable cause to believe that ROE's page about starting a prenatal care agency will have evidence of the crimes described above.

#### Facebook accounts associated with CHAPPELLE ROE

46.　　A search of Facebook for Facebook pages controlled by Chappelle Roe revealed the following that ROE is associated with www.facebook.com/profile.php?id=100074755705412: "Chappelle Roe". That account is connected to at least one of the Facebook accounts identified above.

47.　　ROE is also associated with www.facebook.com/chappelleroe: 1012383023: "BOSS UP Entrepreneurs-Chappelle Roe". BOSS UP Entrepreneurs is the entity that Harris told JACKSON she used to purchase the "setup" for a PNCC Agency.

48.　　Given the connections between ROE and the fraudulent activity associated with the PNCC agencies currently under investigation, there is probable cause to believe that evidence

14

of the fraud will be found on the pages associated with ROE as detailed above. Such evidence may include communications between ROE and the other targets of the investigation, communications between ROE and individuals like Vivian Mealing who is the registered Qualified Professional on many of the PNCC agencies, and statements about ROE's knowledge of, and profit from, the scheme at issue.

### BACKGROUND CONCERNING FACEBOOK[1]

49.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

50.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

51.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request"

---

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

52.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

53.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

54.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be

tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

55.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

56.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

57.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

58.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

59.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

60.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

17

61. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

62. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

63. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

64. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

65. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element

18

or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

66. Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and

their use of Facebook, such as account access information, transaction information, and other account information.

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

67.	I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

68.	Based on the foregoing, I request that the Court issue the proposed search warrant.

69.	Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

70.	This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

20

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to information associated with Facebook accounts

- PNCC AGENCY BOSS LADIES – MILWAUKEE COUNTY
  [203072894566928];

- Chappelle Roe [100074755705412];

- BOSS UP Entrepreneurs-Chappelle Roe [1012383023]; and

- the Facebook Page "How to Start a Prenatal Care Coordination Agency – PNCC

that are stored at premises owned, maintained, controlled, or operated by Meta Platforms,

Inc., a company headquartered in Menlo Park, California.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

I.      **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from March 1, 2020 to the present;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from March 1, 2020 to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, advertising ID, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from March 1, 2020 to the present including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from January 1, 2020 to the present;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

2

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     Records of any Facebook accounts that are linked to the account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the account); and

(r)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

3

**II. Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1347 (Healthcare Fraud), 18 U.S.C. § 1035 (False Statements Related to Healthcare), 42 U.S.C. Section 1320a-7b (Illegal Kickbacks) involving PRECIOUS CRUSE, MARKITA BARNES, LAKIA JACKSON, AND CHAPPELLE ROE since March 2020, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Evidence demonstrating a scheme to defraud Wisconsin Medicaid; evidence demonstrating the provision of kickbacks in exchange for medical services and/or billing; evidence of communications regarding how to conduct billing or avoid detection of billing fraud; communications between or among CRUSE, BARNES, JACKSON, ROE, and other owners or coordinators participating in the fraud; communications between the targets and their clients;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.